GERMANIA IMPORTING CO. *v.* UNITED STATES (No. 1751).[1]

1. EVIDENCE.

The Board of General Appraisers denied an application, made on December 8, 1914, for a commission to take testimony in Bremen, Germany, of the manufacturers of the merchandise at bar as to their custom or general habit of putting certain ingredients into it. In view of the fact that several competent chemical analyses of the merchandise were in evidence and in view of the manifest difficulties in the way of the execution of such a commission, the action of the board is *approved.*

2. LINOLEUM CEMENT—OXIDIZED LINSEED OIL.

Merchandise invoiced as linoleum cement, to be used, after grinding and mixing with other ingredients, in the manufacture of lincrusta wall paper, was classified by the collector as oxidized linseed oil (par. 45, tariff act of 1913). The Board of General Appraisers overruled protests claiming classification either as a cement not otherwise provided for (par. 74) or a nonenumerated article (par. 385). Linoleum cement is oxidized linseed oil containing at least approximately 10 per cent each of rosin and kauri gum. It is shown that oxidized linseed oil may contain as much as 8 per cent of rosin. Chemical analyses of various samples of the merchandise at bar showed no kauri gum and the following percentages, respectively, of rosin: 0, 1.26, 7.1, and 8.2. The decision of the Board is affirmed.

## United States Court of Customs Appeals, December 4, 1917.

APPEAL from Board of United States General Appraisers, Abstract 39912.

[Affirmed.]

*Hatch & Clute (Edward S. Hatch* and *Vincent P. Donihee* of counsel) for appellants. *Bert Hanson,* Assistant Attorney General (*C. D. Lawrence,* special attorney, of counsel), for the United States.

[Oral argument Oct. 17, 1917, by Mr. Donihee and Mr. Lawrence.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

The subject of this appeal was imported from Bremen, Germany, and invoiced as "linoleum cement." Its exact imported status, the record shows, was accurately described by the secretary of the importing company, who testified at the trial below, in the following language:

Linoleum cement is a composition of oxidized linseed oil and resin and kauri, and it comes in mass in canvas burlap sacks holding 200 pounds to the sack, and it is covered with a kind of a chalk or clay of some kind to prevent it sticking to the burlap bag. It is soft, more like rubber only it has not quite the elasticity; it is like crude rubber except it is clearer looking.

---

[1] T. D. 37456 (33 Treas. Dec., 480).

The same witness further described its use and the method of its application thereto as follows:

They grind it up, put a certain amount of clay coloring matter and may be some other things in it; that is ground up, run through a machine, with a steel roller at the base and a bronze roller on top with a design embossed on it; they run a sheet of paper through over which is this lincrusta cement after it has been mixed with these other ingredients; this is pressed through these two rolls with a certain amount of heat, and it comes out fast to the paper with the design embossed upon it.

    *        *        *        *        *        *        *

Q. You say you cut it up like you would a piece of soap and put it into some kind of a machine?—A. In a grinder, a good deal like a paper mill.

Q. Mixed in with——?—A. Coloring matter and also—I don't know if they use wood flour or china clay. Something like that.

The merchandise was assessed for duty by the collector at the port of New York as oxidized linseed oil under the provisions of paragraph 45 of the tariff act of 1913, providing a rate of duty of "10 cents per gallon of 7½ pounds" upon that material in language as follows:

45. Oils, expressed; * * * flaxseed and linseed oil, raw, boiled, or oxidized, 10 cents per gallon of 7½ pounds; * * *.

The chief claims of the protestant, who is appellant here, are that the merchandise should be rated for duty either as a nonenumerated article under paragraph 385, or as a cement not otherwise provided for under the provisions of paragraph 74 of the tariff act of 1913, reading as follows:

74. Plaster rock or gypsum, crude, ground, or calcined, pearl hardening for paper makers' use; white, nonstaining Portland cement, Keene's cement, or other cement of which gypsum is the component material of chief value, and all other cements not specially provided for in this section, 10 per cent ad valorem.

There are other claims in the protest unnecessary of consideration. That the merchandise was dutiable as a cement was mostly relied upon by appellant.

Appropriate classification of this merchandise for dutiable purposes depends entirely upon the state or condition to which it has been brought by the processes applied thereto in its production. Concededly, in the course of its production, it at one time was oxidized linseed oil. Whether or not there have been applied to it sufficient processes, by which the material *per se*, or, by addition thereto of other materials in the course of such processing, to carry the merchandise beyond the state or condition of oxidized linseed oil and into some other condition described by the tariff act, under which it would, therefore, become dutiable, is the question here for decision.

It is claimed by the importer that the article is oxidized linseed oil to which there has been added rosin and kauri by intermixing

and grinding, wherefore the importation has been brought to a condition properly described as a "cement," and for that reason is properly dutiable as a cement not specially provided for under the provisions of said paragraph 74.

The court is of the opinion that if as imported sufficient rosin and kauri have been added to the material to bring it to that condition in which it is to be united with other materials in the manufacture of lincrusta wall paper, whether or not it would be dutiable as a "cement" as that term is used in the catch-all provision of paragraph 74, supra, would present a serious question, unnecessary of determination in this case.

While the testimony upon the subject is meager and unsatisfactory the recognized standard works upon the subject make this plain. Perhaps the most satisfactory and accepted work explanatory of the processing of linseed oil into oxidized linseed oil, and thereafter into a cement, as it is used in the manufacture of linoleum, so called, and in other similar uses, is Spons' Encyclopedia (vol. II, p. 1002, et seq.). It appears therefrom that oxidized linseed oil is made by several consecutive processes. In the first place there are added to the raw linseed oil as driers ground litharge and red lead. (These additions to the extent of one-half of 1 per cent each are also used as testers to determine whether or not the linseed oil is of the requisite quality for its subsequent use in the manufacture of linoleum and other similar articles.) By a complicated arrangement the boiled oil is permitted to run down over pieces of thin cotton fabric technically known as scrim. This scrim is held tight and perpendicular between bars. The oil is then distributed evenly along it so that it flows over the scrim uniformly. It is further stated by the same authority of the process as follows:

Each time the scrim is flooded, its surface becomes covered with a thin film of oil, which oxidizes or solidifies, and slightly increases the thickness. In 6–8 weeks, according to the temperature, the total thickness of the cotton fabric and the oxidized oil upon it will amount to about ½ in.; the whole piece is then known as a "skin." * * * When thick enough, the skins are removed by cutting them immediately below the upper bars, allowing them to fall to the ground, and cutting them into smaller pieces. The oxidized oil obtained in the above manner, is a yellow, translucent substance, of great elasticity, and possessing a smell somewhat resembling that of fresh paint. * * *

The cotton tissue inclosed between the two layers of oxidized oil is found to be completely rotten, the vapors given off by the oil during oxidation having an extremely injurious action, not only upon textile fabrics, but also upon wood, iron, and mortar.

The product of this aerating process is oxidized linseed oil. In this composition there is, therefore, a rosin content added as a drier. It is a part of the ground litharge and red lead. In the process, including the boiling of the oil, much of this content may settle, but

what proportion is not made certain by the accepted authorities or the record.

In its use for the manufacture of linoleum wherein it is further processed to a status or condition known as "cement," the same authority describes the processes applied:

When freshly ground, the oil feels damp, but it dries in 2–3 hours, and is then ready for the following process. This consists in mixing it with a certain proportion of rosin and kauri gum (see Resinous Substances—Kauri, Rosin). The gum, which need not be of the best quality, is first ground under "edge-runners," and sifted; the rosin is added in lumps. The proportions for ordinary linoleum are: Oxidized oil, 8½ cwt., rosin, 1 cwt., kauri gum, 1 cwt. When linoleum of greater elasticity is required, the following mixture may be used, though it is rather more difficult to work: Oxidized oil, 3½ cwt., rosin, 1 cwt., kauri gum, ½ cwt. The mixing operation is conducted in a steam-jacketed pan, fitted with an airtight lid or manhole at the top, and a sliding valve at the bottom, capable of being opened gradually by a screw. * * * Samples are taken from time to time through the lower valve, and, as soon as they appear homogenous, the valve is opened, and the hot mixture, now termed "cement," is propelled by the action of the stirrers into a pair of cold grinding-rollers immediately beneath. * * * After passing through the rollers, the cement is weighed into pans containing 46 pounds each, this being about the quantity required to mix with one sack (56 pounds) of ground cork. The pans are previously whitewashed, to prevent the cement sticking to them. As soon as it has solidified sufficiently, the cement is placed on a stone floor to cool, and is then ready for use. Before mixing with the ground cork, the cement is warmed in a room heated to 43–49° (110–120° F.). The color of the cement is much darker than that of the oxidized oil, the amber-yellow of the latter having changed into a mahogany-brown in the mixing pan. The cement is not quite so elastic as the oxidized oil; but is much tougher, and can be worked into any shape when heated, which is not the case with the oil alone. By varying the proportion of gum and rosin, the degree of hardness and plasticity when heated can be regulated at will. When more generally known, this substance will undoubtedly find many applications in the arts.

Lewkowitsch in his standard work upon Chemical Technology and Analysis of Oils, Fats, and Waxes (4th edition, vol. III, p. 145) describes these processes as follows:

Solidified oil is heavier than water, it is practically insoluble in ether, chloroform and carbon bisulphide. On a large scale this substance is prepared by two methods. The first consists in allowing linseed oil (previously "boiled" with a drier in order to accelerate the oxygen absorption) to run over "scrim," a light cotton fabric hanging down from the ceiling of a high building, the temperature of which is kept at about 100° F. A portion of oil solidifies on the fabric; the oil which drains off is again pumped up and allowed to run down until the layers of the semisolid mass have reached (after several weeks) the thickness of about half an inch. This process is termed the "scrim process"; the solidified oil obtained by this method is termed "scrim oil."

The second method consists in passing a current of oxygen gas through linseed oil intermixed with a drier and heated by steam in jacketed pans. When the maximum amount of oxygen has been absorbed, the mass forms a thick viscous fluid, which will still flow whilst hot, but on cooling solidifies to a substance similar to the "scrim oil."

While this author describes a third process for the production of oxidized linseed oil in which such driers are not used, the samples of

this importation and the analysis thereof demonstrate that that process was not here applied. There are in these samples, according to analysis and apparent upon examination, particles of scrim, and, according to analysis, particles of rosin. There was introduced in evidence an illustrative exhibit which is in the form of a sheet about one-half inch thick and through the center of which is a scrim cloth. It is obviously, in the light of the described processes, oxidized linseed oil retaining therewithin the scrim over which the boiled linseed oil was poured in the process of oxidation. The imported sample is in the form of a lump having a darker appearance, which may be due to admixture of foreign materials or the added thickness of the importation. It also contains many particles or fibers probably of scrim. It is at least oxidized linseed oil ground and pressed.

The issue here then is, whether or not there have been added to this importation sufficient amounts of rosin and kauri to constitute the article a cement of the character hereinbefore described. The Government chemist reported on analysis that no rosin was found in the sample analyzed by his office. His detail analysis, however, in the record shows "Lead and calcium oxides, etc., 2.28 per cent." On cross-examination he testified: That he had frequently analyzed oxidized linseed oil and "nearly always" found rosin in it, and particularly:

Q. By Mr. WELCH. What is the highest percentage that you have found?—A. Well, not in the sample, of course, before the board, but in other samples I have found as high as 8 per cent.

Q. In oxidized linseed oil?—A. Yes, sir.

Q. Which you say is added as a drier?—A. Yes, sir.

Q. Is it added in the form of a rosin as a drier?—A. It is added in the form of a lead manganese or lead and calcium rosinate, and that substance contains about— well, 38 per cent, something like that, of rosin. Now, on one occasion I found there 2 per cent of lime and lead oxides in oxidized linseed oil, so that would be about— that would equal alone, if there were no fatty acids present or anything else, that would equal over 4 per cent of rosin.

Q. Well, is there any mode of determining by chemistry whether rosin has been added in and of itself as rosin, or was added as a drier in the forms you have mentioned?—A. Oh, no; you could not distinguish.

Q. You could not tell by chemical analysis?—A. No; it would be impossible.

If 2 per cent of lime and lead oxides "would equal *over* 4 per cent of rosin," as testified by the Government chemist, 2.28 per cent reported by him in this sample would equal over 4.56 per cent rosin in this sample. This apparent conflict in testimony is probably due to the fact that the Government chemist classed such merchandise as this as well as oxidized "skins" as "oxidized linseed oil." His testimony so indicates.

On the other hand, analyses made by admittedly competent chemists on behalf of the importer show in one sample 1.26 per cent of

rosin and in the other 7.1 per cent of rosin, while another competent chemist reported in another sample 8.2 per cent of rosin. No kauri gum is shown by any of the analyses.' In order to constitute it such a cement according to the above authorities there should be at least approximately 10 per cent of rosin as well as 10 per cent of kauri gum. In order to constitute it a cement, however, it is claimed by the Government it should be shown not only that these rosin and kauri contents were present in the article at the time of importation, but also that they were admixed with oxidized linseed oil for the purpose of making a cement rather than as an incident of the process of oxidation of the oil. While this contention may be questioned it is certainly true that a sufficient content of both rosin and kauri should be present in the imported article to constitute it a cement.

It appears from the record that in order to employ the importation in the manufacture of lincrusta for wall paper, the purpose for which these importations were to be used, there must be added thereto certain other foreign substances. It is not made plain by the record whether or not these consist of coloring and wood flour or china clay, but it is made plain that in the application of this cement to its lincrusta employment the addition of some of these foreign substances is necessary to produce lincrusta wall paper.

We do not think, however, that the addition of these substances is necessary to constitute a cement any more than the addition of the cork in the linoleum is necessary to produce the oxidized linseed oil therein used, a cement. This particular cement is constituted when there is added to oxidized linseed oil the proportionate quantity of rosin and kauri for its use in conjunction with the china clay or wood flour or the cork in the lincrusta wall paper or linoleum, as the case may be.

The board found as a fact in the case the addition to the oxidized linseed oil of the stated percentages of rosin and concluded therefrom, that, inasmuch as it could not be determined whether or not this was added for the purpose of making a cement or incidentally present from the process of making oxidized linseed oil, the importer had not proven his case. There is no evidence in the record as to the presence of kauri which is clearly essential in the manufacture of a cement of this character.

On December 8, 1914, the importer made application to the board for a commission to take testimony in Bremen, Germany, as to the rosin and kauri contents of the importation. The board denied this application and overruled the protests of the importer. While we do not approve the reasoning of the board, we are unable to say that the evidence warranted any other conclusion.

In view of the several analyses made of the particular imported articles as to a rosin content it is entirely within the view of the

board that any deposition presented by the importer and manufacturers as to their custom or general habit of admixing certain kinds of rosin that such testimony could not be accepted as overcoming the proofs by analyses already offered by the importer. At most such a deposition touching the general practice of the exporters may have been viewed by the board as conflicting with the analytical evidence as to the particular importation and, therefore, not sufficient to establish the case of the importer. The court, therefore, is unable to say that the board abused its discretion in disallowing this commission. The strong improbability of an ability to execute such a commission no doubt influenced the board in refusing such a commission as it would this court at the present time in directing the board to issue the same.

*Affirmed.*

### CONCURRING OPINION.

BARBER, Judge: I reach the conclusion that the board should be affirmed for the following reasons:

The classification as oxidized linseed oil is presumed to be correct. The importers has made several alternative claims in the protest, apparently relying here upon two, namely, that the merchandise is a cement under paragraph 74 and if not so, that it is a nonenumerated manufactured article under paragraph 385 of the tariff act of 1913. Of course, the burden is upon it to establish that the merchandise is not oxidized linseed oil, but that it is either cement or a nonenumerated manufactured article.

The board has heard all the evidence, and sustained the assessment, and I do not think on the record its action should be reversed. No one with definite knowledge on the subject has undertaken to state precisely how oxidized linseed oil is made. Generally speaking, however, it appears from the testimony of witnesses on both sides that linseed oil is boiled at a temperature, and exposed to the air through the agency of some sort of cloth or fiber, the oxidization being sometimes aided by an oxidizing material. All the witnesses having knowledge agree that there is a fiber in the samples before us. One of the importer's chemists testified that he recognized the basis of the articles to be oxidized linseed oil and testified specifically as follows:

Q. But taking the mass as a whole, you would recognize it, wouldn't you, as oxidized linseed oil?—A. Looking at it superficially, yes.

Q. Looking at it superficially and in conjunction with your analysis, it still responds in general for tests of oxidized linseed oil? A. The greater part, yes.

The other of the importer's chemists who had never analyzed oxidized linseed oil was unable to say whether the resinous substance which he found was the result of the deliberate introduction

of resin or of the chemical action of the material used in oxidized linseed oil. On the other hand, the Government chemist testified that he had analyzed oxidized linseed oil on various occasions and nearly always found resin present, although he did not find it in the sample of the merchandise submitted to him for analysis, and that its presence was not inconsistent with the fact that the article was oxidized linseed oil. Other samples not in this case, which he had analyzed, contained, he said, as high as 8 per cent of resin. I note also that importer's chemists found the resin content to vary from 8.2 to 1.26. The Government examiner who testified to some eight years' experience in examining and passing oxidized linseed oil, also testified that he passed the merchandise here, was familiar with it, that it was apparently the same material and identical in appearance with the oxidized linseed oil which he knew.

On the record I think the judgment of the Board of General Appraisers should be affirmed because importer has failed to successfully maintain the burden of showing not only that the assessment is incorrect but also to sufficiently establish the classification for which they contend.

In this view the board may well have been within the legal exercise of its discretion in denying a motion for a commission to take testimony abroad. The purpose of taking that testimony as disclosed in the affidavit of counsel was to show what in fact the ingredients of the merchandise were, claiming that the desired testimony would show that it contained resin and kauri. But kauri is a species of resin and the affidavit does not claim that the evidence he wished to obtain under the commission would show a greater amount of resin content than that disclosed by the chemical analysis made on behalf of importers, hence the board may well have reasoned that such evidence would be merely cumulative as to a fact already established.

MONTGOMERY, Presiding Judge, concurred.